Next we'll hear United States v. Zodiatis, if I'm pronouncing the defendant's name correctly. It's Zodiatis. Zodiatis. Thank you very much. You're welcome. My name is Bob Hemley and I represent Mr. Zodiatis. In its closing at the trial in this case, the government argued that Virginia law did not matter and should have no bearing at all on Mr. Zodiatis' intent. That was an error which we asked Judge Arcara to correct and which he declined to correct. I don't understand how the proposed instruction would have solved that problem. Say that again. I don't understand how the proposed curative instruction would adequately address that problem because it seems to me that the things in the proposed instruction are just simply not correct. Well, I'm not sure what aspects of the proposed instruction Your Honor is taking issue with, but what we asked Judge Arcara to say was that Virginia law controlled the question of Ms. Jenkins' parental rights. That was confusing, wasn't it? Because there's a principle of Virginia law that applied, but Virginia law had pointed directly to Vermont. Well, that is exactly the point, Your Honor, that we were trying to impress upon Judge Arcara and we would impress upon this Court as well. Vermont law mattered only because Virginia law said that it mattered. I'm not speaking about the Affirmation of Marriage Act and the dispute between Virginia and Vermont with regard to custodial rights associated with same-sex marriage. Is that it ended by the time the important facts here occurred, right? Yes. That was over. No, that had not been settled, no. Obergefell had not yet been decided. These events took place over a period from 2003. By the time of the trial. By the time of trial, yes, Your Honor. And the Virginia court had said that the Vermont border controlled, no? The Virginia law did not say... The point, I'll answer your question directly. But my point is, if that's correct, what's the prejudice here? In other words, the Virginia courts themselves had held that Vermont law was controlling, so wasn't it therefore a proper argument that Vermont law was controlling and Virginia law was functionally irrelevant? I appreciate the question. The central issue in this case, as Judge Arcaro announced when he granted bail and said that if he was wrong and we are right, there's going to be a reversal in this case. An extraordinary statement for this particular judge to have made. The central issue in the case was Mr. Zodiotis' intent. His intent was formed upon an understanding of whether or not Virginia law or Vermont law established rights, whatever they may have been. Because of this enormous dispute between the two states. Even though at the end of the day, the Virginia court said, while... And there were many decisions in many Virginia and Vermont courts. While the Virginia court said, we don't necessarily agree with the Vermont ruling, but we feel we have to give full faith and credit to the family court judge in Vermont. That was what drove the rights. And that was decided in 2006 at the appellate level and in 2008 at the Virginia Supreme Court level. I mean, I don't see what your client wanted the judge to tell the jury about the controlling law. That's the point. Virginia itself agreed that on the custody question, Vermont's decision controlled. So to that extent, I'm not sure that there's any reason to charge anything other than Vermont is the controlling law. The judge allowed your client or allowed your client's lawyer to argue that there was confusion about the states of the law and that that showed that he didn't have culpable intent. But the charge you wanted would have suggested that Virginia law controlled, and that would have been confusing to a jury here. Where is the error? The error is in your Honor's recognition that there was confusion. In your client's mind, there was confusion. There was no confusion after 2006. Well, I would take issue with that, Your Honor, but I understand. There was no Virginia court ruling that was favorable to the mother at that point. There were continuing challenges. Right. But the only rulings of courts were in favor of the other parent. The fact that there were continuing appeals until even after, Mr. Zodio. You were allowed to argue to the jury. You were allowed to argue that. What you weren't allowed to suggest was that Virginia law favored the mother, the mother in possession of the child. Yes, and we weren't trying to argue that. Well, what is the charge you wanted? I mean, the charge you wanted suggested that Virginia law controlled, and it only controlled in the sense that it approved Vermont law. We wanted the charge that made clear that Vermont law was found to have been controlling. It wasn't controlling. How would that have helped you? Because it would have allowed the jury, the whole argument that I made, I tried the case. The argument that I was trying to impress upon the jury is that they needed to put themselves in Mr. Zodiotis' mind. They needed to see the world and the dispute as he saw it. And that included understanding that the only reason that Vermont law was said to control is because the Virginia court said so. He's a layperson. He doesn't know. He's being told by Liberty Council and a number of other people who presented themselves as experts that this was all wrong. It had been decided incorrectly that Virginia law really was going to control in the end that there were ongoing appeals. And so we wanted the judge, Judge Arcara, to explain to the jury that Virginia law did, in fact, matter. It mattered very much. And have in mind that there were continuing, ongoing appeals. And the matter wasn't actually settled until 2010, until the spring of 2010. What was the good faith basis for your client to think he could remove a child from this country while appeals were pending, but the last ruling would not have allowed that? It's not a question of good faith basis. Under the International Parental Kindapping Act, Your Honor, the requirement is, the crime is acting with intent to obstruct. Right. Well, the last rulings of both the Virginia and Vermont court before your client helped remove that child was favorable to the Vermont parent. It's a subjective determination by the actor, Your Honor. Not to mention, didn't your client take steps to conceal his activities and, you know, help get the mother across the border in the dead of night and all sorts of other things that would be consistent with a finding of intent? I think it would be fair to say that there was evidence. We certainly are not going to concede that he acted in that manner, but certainly we would agree that the government presented evidence to that effect. Well, you have the e-mail. I think it's a January 2009 e-mail. Yes. And the government can certainly argue, and the jury was, it seems to me, within its province of finding that at that point he knew he was rubbing up against Vermont law when he took her. I'm very familiar with the e-mail, Your Honor, and I understand what it says, but I think I would ask that the court have in mind that there were many other communications that came after January of 2009 that either negated that or suggested that the situation was different than he may have understood in 2009. And his actions didn't take place in January of 2009. They were much later. If I may, I know, but I would submit with respect that the extended nature of my argument has been a result of my answering questions that you've put. That's what you're here for, though. No, I just wanted to make another point. Very quickly, because I know you want to save time for rebuttal. I want to save time for rebuttal, and I also . . . Just make your point, counsel. Okay. My point is that this court ought to wait until the Carpenter decision is decided. It's under advisement. It raises exactly the same Fourth Amendment rights, and having listened to the oral argument, I can tell you that, at least in my view, all eight of the justices who spoke seemed extremely sympathetic and concerned about the invasion of privacy issues. Thank you. But Carpenter won't get you . . . If Carpenter comes out the way you want, you still have a good faith problem, a good faith exception problem. Well, I'm happy to respond to that, if I may, Your Honor. Go ahead. Okay. I don't think the good faith exception applies in this case for a number of reasons. First of all, the Stored Communications Act makes it very clear that the information that was sought could not be sought by a subpoena. There was no law to the contrary here in the United States Supreme Court or anyplace else that said . . . There's no suppression provided for for violations of the Stored Communications Act, so it's only the Fourth Amendment challenge that gets you suppression. So, tell us why. I mean, this Court itself has already said that prior to Jones, which is decided after the events here at issue, any expectation of privacy that a person had in his cell phone location was dubious at best. Now, Carpenter may find differently going forward, but the suggestion is that certainly that was not the case at the time the officers acted here. So, to respond to Your Honor's question . . . How is there not good faith? So, you have in mind the case of U.S. v. Aguiar, which was a 2000 and I believe it was a 2013 decision. It may have been earlier. In any event, at the time that the subpoena was issued in 2011, Aguiar was earlier, and before 2011, we had cert having been granted in Jones with an expression of interest in this issue. We had United States v. Maynard in the D.C. Circuit, which had made it very clear that . . . Well, I think that good faith exception requires an understanding by those who are acting that there's binding precedent either here . . . This is what this Court said. The binding precedent has to be either here or in the United States Supreme Court. Smith and Miller are the binding precedent. No. The Supreme Court recognized that even in Jones, because Justice Sotomayor talked about perhaps the need to reconsider Smith and Miller, though she conceded that it wasn't necessary in that case. Well, we're talking here about cell phones. We're not talking about bank records. We're not talking about pen registers. The cases are replete with the discussion of why that is an important distinction, but . . . . . . saying that there isn't an expectation of privacy in cell location information. Again, Carpenter may tell us differently, but for good faith purposes, there seems to be nothing that would have told an officer that this required a judicial warrant. Well, I take issue with Your Honor's conclusion, because U.S. v. Maynard in the D.C. Circuit was a 2010 case which said exactly the opposite. But as you said, it doesn't control . . . it's not the controlling precedent of the Supreme Court or this Court. No, but what I think the Court also needs to keep in mind are the two Eastern District of New York cases, which are cases of district courts within this circuit. One of which is reversed, is a magistrate judge's decision which gets reversed by the district court. Right. And the other is a district court opinion that stands, but that's hardly controlling Second Circuit authority. And isn't that on the Stored Communications Act specifically? Well, they were decided on the same issue, Your Honor. They were decided on the question of whether or not there was an invasion of privacy in collecting cell phone location . . . site location data without a warrant. We hold officers to the controlling precedent of the Supreme Court in this circuit. I'm not sure we've ever suggested that they are required to read the opinions of district court judges. And especially ones that, as I said, like this one, don't necessarily involve the same statute, have a different decision reversed by a district court. That's not what we expect of law enforcement officers. I'll finish with this . . . To my chagrin, just to be clear. I beg your pardon? To my chagrin, I think they should be required to read district judge opinions. I agree with Your Honor. All right. I will say . . . I'll close this aspect of my remarks with one observation. Justice Breyer, in the argument in Carpenter, said that the assistant U.S. attorney should have known better than to have proceeded with a subpoena . . . or to proceed in that case without getting a warrant. Justice Breyer starts talking about subpoenas and he says you just should know better. I mean, it's not . . . you talk about good faith and I appreciate it. It's clear that you're not allowed to get this kind of information under the Sword Communications Act, which I appreciate doesn't have an exclusionary element to it. But you have these other cases, Maynard, the two Eastern District of New York cases, and you also have cert having been granted in Jones. All right. Thank you. Thank you, Your Honor. Good morning, Your Honors. My name is Paul Van de Graaff. I'm an AUSA from Vermont, though in this case I was assigned to help with the prosecution in Buffalo. Appellant's curative instruction argument is a prosecutorial misconduct claim, not a jury instruction claim. Even today, and in Appellant's brief, Mr. Zodiatis doesn't argue that the jury instruction that Judge Arcaro gave is in any way improper. Judge Arcaro in the bail decision stated that prior to his decision, every court that had opined on the issue had concluded that parental rights are defined by the law of the state of habitual residence of the child immediately before the challenged actions. Number one, do you agree with that? Number two, is that the law? Of the three cases that talk about this, I agree that that's what they say. But I don't agree that's the law. And, in fact, Appellant doesn't really argue that that's the law. Is that what the Hague Convention says, though? No, I don't believe it's what the Hague Convention says, Your Honor. Let me hear from you as to why not. So the Hague Convention is an international treaty about which country's law will apply. There is no court or statute or regulatory system that supervises the regulation between countries. So, therefore, the only law that could operate in that arena is a treaty. And it says, the treaty says, that the parental rights will be defined between the countries in accordance with which country the child had lived in in the six months before the child was removed. But that doesn't control the International Parental Kidnapping Statute. Because the International Parental Kidnapping Statute is a federal law, and it defines for this court, it's interpreting that federal statute that this court would be called upon to decide. That statute says that parental rights are defined by legal authority, court order, or binding agreement between the parties. Let me be sure I understand you. The federal statute says that parental rights are determined by reference to state law in accordance with the Hague Convention. Your Honor, I won't interrupt. I'll let you finish. No, go ahead. That's not what the statute says. The legislative history to the statute in one quick section mentions the Hague Convention. The Hague Convention is not mentioned in the statute at all. The Hague Convention is mentioned in the, I think it's a Senate report or a House report, giving some interpretation to this provision. It's only like a sentence long. I argue that. But didn't we hold in United States v. Amer exactly what I've just said to you, that the statute is determined by reference to state law in accordance with the Hague Convention, which references the habitual residence of the child before leaving the country? Certainly, Your Honor. In Amer, however pronounced it, if it's Amer or Amer, I don't remember, I don't know how to pronounce it. In that case, the court said where there is no prior litigation, where there hadn't been any custody jurisdiction established before the kidnapping, where there was no binding agreement between the parties about where custody would be determined, in those places where the court had to look to what law defined custody rights. To be clear, this is your gloss on Amer. It's not, you say where, that the court said these things. There's nowhere in the opinion that the court said those things. But, Your Honor, in Amer, the court didn't talk about anything else. Amer, the facts of Amer. I'm just trying to clarify. I understand that's your argument and that it's based on the facts in Amer because there was no agreement between the parents or court order. So, in the absence of those things, you look to the habitual, the law of the state in which the child had lived. Is that, that's your argument and your gloss on Amer, correct? That's correct, Your Honor. But the court itself doesn't articulate that and state in so many words that only in the absence of a court order or agreement between the parties. That's your take on the case and your reading of the statute. This is certainly my interpretation of the case. Your Honor, the court didn't talk about this fact circumstance in this case and it did not talk about that. So, yes, the case addressed the facts it was addressing in that case and didn't talk about these facts. Do you know if there's any prior case like this where the custody rights at issue were determined by court order? So, in other words, where the court, as you're asking us, looked to the court order rather than the state in which the child had lived? I'm not aware of any reported decision about that. I imagine there might have been international penalty kidnapping cases where, well, I shouldn't say that. In the Miller case that this court previously decided, they actually came out of Vermont, a different Miller, a different kind of case. There was discussion in the court about the controlling aspects of court orders, though they weren't addressing this particular issue. But in that Miller case that I don't have the citation for in my notes here, there is discussion about the impact of court decisions on custodial parental rights. Why do you want us to get into this when Virginia itself in this case recognized the validity, indeed superiority, of the Vermont order? Why do we even need to get into this question? Well, I'm not sure you need to, Your Honor. You don't need to reach this issue. If you did reach this issue, I think you should address it consistently with the government's position. The government here actually would encourage the court to— I assume that Virginia law controls accepting the argument that counsel says that Virginia is the place of the child's residence. Virginia's law said that the Vermont court order was what controlled custody, right? Your Honor, now you're getting me into a little bit of a law school choice of law question. I don't believe the Virginia courts were saying that Virginia law said that Vermont law applied. The Virginia courts, in their choice of law decision, said that federal law compelled us to apply Vermont law. So in our old sort of choice of law thinking, the government agrees that if this court were to hold that Virginia law controlled parental rights in this case, we lose. Virginia law at the time of the abduction did not authorize parental rights for lesbian couples. Why do you make that concession given the Virginia court ruling that said we look to the Vermont? They were not applying Virginia law, Your Honor. The Virginia courts—there's a distinction between what courts are ruling and what the law of a state is. And the Virginia courts held that federal law required us— Vermont law? Well, so now we're getting into a question of— And doesn't this ultimately get to the point that this is all way too confusing to explain to a jury, let the lawyers argue it, and nobody took issue with the original set of instructions? Is that correct? Your Honor, that's certainly what the government's position is. To the extent you weighed into this question of a mayor and what it means and what the statute means, we'd ask you to consider our position on that. But our main position is this is a prosecutorial misconduct argument. And the government argued the significance of the evidence and argued it in a way that is much tamer than this court has previously approved the government— I mean, the government's been allowed to say that the defense is a fairy tale, that the defense is hogwash, that the defense is a smokescreen. Here, the language the government used to respond to the defense arguments about facts is much tamer than that. I mean, this is really a prosecutorial misconduct. Your Honor, this is a potential confusion argument. I mean, I think the spin you're putting on it is too fast. Your Honor, if you don't have any other questions, I'll turn to the Fourth Amendment issue. I think as several of you have noted, I don't think that the court needs to reach the Fourth Amendment issue necessarily. The simplest course for this court is to follow the process in Aguilar that the government here acted in good faith reliance, that it could issue a subpoena for business records. And it's very important from the government's perspective that the court distinguish this case from the facts of Carpenter as well. The government did not use any process to get historical cell site information, which I'm sure your honors all know is not part of the business bill that a customer receives from his cell phone company. Cell phone location information is information maintained by the cell phone company independent of the business transaction and business records between the two parties. There seems to be a dispute in the party's briefs as to whether this location information, if I can call it that, although I understand you're arguing that that's a different thing, as to whether this was part of the regular bill produced by the cell phone company in this case. Can you clarify that and is that clear in the record? I think it is clear in the record, Your Honor. Whether we've made it clear enough in the briefs or not, I don't know. The government issued a subpoena in 2011 for call detail information and subscriber information like it does every day. And I think AUSAs or U.S. attorneys across the country ask for that kind of information. And they expect to get subscriber information and call detail information. The language is pretty broad. That's part of the argument is that the language crosses the line from the statute's subpoena requirements to the statute's court order requirement. But what the record showed below in Document 30 in the district court is that Entelos, the cell phone provider, interpreted this subpoena the same way it interprets all subpoenas that are asking for things that are allowed to give data. It's allowed to give under 2703C2. That is sort of base of subscriber information and call detail. And that the only call detail information that Entelos had were these detailed cell phone bills. Why isn't where I am call detail information? Well, because call detail information under the general understanding of 2703 is the calls made by each phone, the call, the number that was called. Whose general understanding? Well, that's what 2703C2 talks about call information. That is the called numbers, the numbers being called, numbers being received every day. If I'm sitting in the, if I'm a record keeper at this phone company and you ask for call detail information, I could easily conclude that that's location information. But, Your Honor, I think that the practice and the understanding between companies and the government is that they don't get that. Cell phone companies don't give historical cell site information, which we didn't get in this case, by the way. We didn't get historical cell site information from our subpoena. We got call detail bills. Those bills are in the supplemental appendix. You can see what they look like. They look like the kind of cell phone bills that somebody gets. Now, getting back to Judge Furman, you asked whether he got those. In the pre-trial litigation, it was uncovered that Response Unlimited, the subscriber here, got summary bills, not these detailed bills, because they'd chosen in their business relationship to only get summary bills, not detailed bills. If Carpenter wins, would you agree that going forward you need a warrant for this information? No. I don't believe that, Your Honor. I believe that we don't know how Carpenter is going to be decided, but I don't believe that Carpenter will decide that these kind of basic records, that is, billing records, between a client and a company will be the kinds of records that the Supreme Court, even if they contain location information, some general location information, will be the kinds of records that require a search warrant. Every one of our bank records, Your Honor. If the Supreme Court answers the cert-granted question, yes, you're wrong. I don't think so, Your Honor. In fact, in the oral argument that Mr. Hemley mentioned, the petitioner conceded that the government could subpoena call detail records from a cell phone provider and not run afoul of their arguments in the Supreme Court. Now- There was some location information here, correct? Well, there is a column that says- Service location. Service location. There is that. There's no doubt that that's on the bills, but- Then it has a geographical location. It has a very broad description of generally where the phone is. That's location information. Well, so is- if that's true- That's location information, right? But the Supreme Court isn't deciding- Right? Yes. Has this court ever held that suppression is not an available remedy for a violation of the Stored Communications Act? No. Has they held- maybe I got confused by your double negative there. This court has never suggested- no court has suggested- But has this court ever held that suppression is not an available remedy for a violation? I don't know the answer to that question, Your Honor. All right. Unless the court has any questions. Thank you, Your Honor. I will try to respond to some of the arguments, Your Honors. First of all, can I ask you- the definition of parental rights in the statute- and we are construing the statute, after all- M says arising by operation of law, court order, or legally binding agreement of the parties. Your adversary construes our decision in Amer as basically relying solely on the arising by operation of law because there was, in that case, no court order or legal agreement of the parties. Here, there was a court order, namely the Vermont court order, correct? So why, given the plain language of the statute, does that not control? I don't think that the Amer decision should be read to limit the analysis to one prong or another. But if you read Amer in the way that you're suggesting, doesn't it read out of the statute the language, court order, or legally binding agreement of the parties? And isn't there a general proposition that we don't do that sort of thing? No, I don't think so. What role would those words in the statute play? Well, it has to be a valid order. It has to be a valid agreement under the state law. Are you taking issue with whether the Vermont order was a valid order? No, not at all. No, I'm not taking issue with that. So, in other words, given the language of the statute, why was your proposed instruction correct? There was, indeed, a court order here. So given that, doesn't the court order control and wasn't the judge correct in not providing the instruction that you proposed? We move into these more complicated questions, if I may answer that, because it's not a question of recognizing whether it's a court order or an agreement or the sheer operation of law. It's the fact that Virginia gave life to the court order. It was the Virginia law that actually governed here. That is the underlying operating principle. You're confusing everything, because the statute talks about a court order. Vermont issued it, and Virginia recognized it. I don't know what more the jury needed to know. Well, the jury needed to— You're suggesting that you wanted the jury to know that if Virginia had gotten the question first, they wouldn't have answered it the same way as Vermont did, but that's irrelevant. No, I'm not asking for that. All right, so the statute says that parental rights can be determined by court order. That's what we had here, issued by one state and recognized by another, recognized by the state that was the child's last place of residence. What's the problem with the judge's actions? The problem with the instruction is that it didn't make clear that it was, in fact, the Virginia law that essentially enabled the Vermont law, that there was an interplay between these states, and it's especially important in the context of the ongoing dispute that went into 2010. How would that have helped you? The only valid court order at that point was the Virginia order. It would have helped me because rather than having left uncorrected a statement that Virginia law is irrelevant to Mr. Zodiotis' intent, Virginia law doesn't matter. The judge, who the jury looked to for instruction and who this circuit said must give correct statements of state law. But to be clear, you're not arguing that the judge gave an incorrect statement of the law. In fact, you, I think, agreed in advance of the summations to the instructions that explained that Vermont law was, in fact, controlling. You requested a, quote-unquote, curative instruction based on the summations, but you were allowed to argue. There's no argument that the judge precluded you from making the arguments that you're now making, namely about Virginia law and its relationship to your client's intent, and there's no argument that the judge instructed the jury that those arguments were improper or incorrect in any way. So what's the error? The error is in leaving unchecked a statement that contradicted the originally agreed-upon charge. But the judge also told the jury that my instructions as to the law are controlling, and whatever the lawyers may tell you, if it's inconsistent with what I tell you, disregard them and follow my instructions, correct? Yes, that, of course, is the standard jury instruction. But in this context, with the prosecutor making statements that Virginia law does not matter and is irrelevant to the issue of intent, it needed to be corrected so that the jury would correctly understand the interplay of these two jurisdictions. Your whole presentation was that in the evolution of this law case, there was potential for confusion. At one point, Virginia legal principles about marriages may have been pertinent, later they weren't, and so forth. So because of all this confusion, he didn't have the requisite intent. That was your pitch, right? That was the central issue, yes, Your Honor. Thank you very much, Counsel. All right, thank you. Very interesting case. Thank you all. Thank you. Court is adjourned.